**Rosemary SIRING, Plaintiff,**

v.

**OREGON STATE BOARD OF HIGHER EDUCATION, acting by and through EASTERN OREGON UNIVERSITY, Defendant.**

Case No. 3:11–cv–1407–ST.

United States District Court,
D. Oregon,
Portland Division.

Nov. 29, 2012.

Craig A. Crispin, Crispin Employment Lawyers, Portland, OR, for Plaintiff.

J. Michael Porter, Cody J. Elliott, Portland, OR, for Defendant.

### OPINION AND ORDER ADOPTING FINDINGS AND RECOMMENDATION

SIMON, District Judge.

Magistrate Judge Janice M. Stewart issued findings and recommendation in the above-captioned case on October 3, 2012. Dkt. 39. Judge Stewart recommended that Defendant's Motion for Summary Judgment, Dkt. 24, be GRANTED IN PART and DENIED IN PART. Defendant timely filed objections. Dkt. 41. Plaintiff has responded to those objections. Dkt. 43.

Under the Federal Magistrates Act ("Act"), the court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files objections to a magistrate's findings and recommendations, "the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.;* Fed. R.Civ.P. 72(b)(3).

The Court has reviewed *de novo* those portions of Judge Stewart's findings and recommendation to which Defendant has objected, as well as Defendant's objections and Plaintiff's response. The Court has also reviewed both the Declaration of Cody J. Elliott dated October 22, 2012 (Dkt. 42), which accompanied Defendant's Objections, and the Declaration of Craig A. Crispin dated November 5, 2012 (Dkt. 44), which accompanied Plaintiff's Opposition to Defendant's Objections. Although these declarations were not before Judge Stewart, this Court may "receive further evidence" in the course of reviewing a Magistrate Judge's findings and recom-

mendations. 28 U.S.C. § 636(b)(1). Plaintiff states that "[t]his extraordinary procedure has not been found by plaintiff to have previously been used to supplement a summary judgment record within this District or even within this Circuit." Pl.'s Opp'n at 10 n. 3. Plaintiff may have overlooked *Hamilton v. Silven, Schmeits & Vaughan, P.C.,* Case No. 2:09–cv–01094–SU, 2011 WL 6888564, at *6 (D.Or. Dec. 23, 2011) (citing *Spaulding v. University of Washington,* 676 F.2d 1232, 1235 (9th Cir.1982) (court may hold new hearing and take new evidence)). Having reviewed the parties' submissions and declarations *de novo,* the Court agrees with Judge Stewart's reasoning and adopts those portions of the findings and recommendation.

▮ For those portions of a magistrate's findings and recommendations to which neither party has objected, the Act does not prescribe a standard of review. Indeed, where there are no objections, "[t]here is no indication that Congress ... intended to require a district judge to review a magistrate's report[.]" *Thomas v. Arn,* 474 U.S. 140, 152, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *see also United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003) (*en banc*), *cert. denied,* 540 U.S. 900, 124 S.Ct. 238, 157 L.Ed.2d 182 (2003) (the court must review *de novo* magistrate's findings and recommendations if objection is made, "but not otherwise"). Although review is not required in the absence of objections, the Act "does not preclude further review by the district judge[ ] *sua sponte* ... under a *de novo* or any other standard." *Thomas,* 474 U.S. at 154, 106 S.Ct. 466. Furthermore, the Advisory Committee Notes to Fed.R.Civ.P. 72(b) recommend that "[w]hen no timely objection is filed," the court review the magistrate's findings and recommendations for "clear error on the face of the record."

For those portions of Judge Stewart's findings and recommendation to which neither party has objected, this Court follows the recommendation of the Advisory Committee and reviews those matters for clear error on the face of the record. No such error is apparent.

Therefore the Court orders that Judge Stewart's findings and recommendation, Dkt. 39, are ADOPTED. Defendant's Motion for Summary Judgment, Dkt. 24, is GRANTED IN PART and DENIED IN PART as follows: (1) the Motion for Summary Judgment is GRANTED as to the Third, Fourth, and Fifth Claims (alleging retaliation) only to the extent that they are based on actions taken after Plaintiff's March 2010 email, which is not a protected activity, and after Plaintiff filed her Tort Claim Notice and BOLI complaint in July 2010 due to lack of causation; (2) the Motion for Summary Judgment is DENIED as to those portions of the Third, Fourth, and Fifth Claims (alleging retaliation) to the extent they are based on actions taken after Plaintiff sent her May 24, 2010 letter; and (3) the Motion for Summary Judgment is DENIED as to the remaining claims.

## FINDINGS AND RECOMMENDATION

STEWART, United States Magistrate Judge:

### INTRODUCTION

This case arises out of the termination of plaintiff, Rosemary Siring ("Siring"), by her former employer, the Oregon State Board of Higher Education, acting by and through Eastern Oregon University ("the University"). On October 19, 2011, Siring filed a Complaint in Multnomah County Circuit Court for the State of Oregon, Case No. 1110–13749, alleging various employment discrimination and retaliation claims against the University. The Complaint alleges the following eight claims for relief: (1) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 USC § 623(a) (First Claim), and the corresponding Oregon statute, ORS 659A.030 (Second Claim); (2) retaliation for opposing unlawful discrimination in violation of 29 USC § 623(d) (Third Claim), and corresponding Oregon statutes ORS 659A.030(1)(f) (Fourth Claim) and ORS 659A.230 (Fifth Claim); and (3) disability discrimination in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 USC § 12112(a) (Sixth Claim), ORS 659A.112 (Seventh Claim), and Section 504 of the Rehabilitation Act, 29 USC § 794(a) (Eighth Claim).

On November 21, 2011, the University filed a timely notice of removal pursuant to 28 USC §§ 1441 and 1446, asserting federal question jurisdiction under 28 USC § 1331. The University then filed a Motion for Summary Judgment (docket # 24) on all claims. For the reasons set forth below, that motion should be granted in part and denied in part.

### STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir.1999) (citation omitted). A "*'scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly pro-bative,' " does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F.3d 989, 1014 (9th Cir.2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In employment discrimination cases "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.) (internal quotations, citation omitted), *cert denied*, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996).

## FACTS

### I. *The University's Tenure–Track Requirements*

Tenure-track faculty members in the Oregon University system are governed by the Oregon administrative rules, the University's Promotion and Tenure Handbook ("Handbook") and a collective bargaining agreement between the University and the Associated Academic Professionals, Local 6200 of the American Federation of Teachers, AFL–CIO ("Union"). Jaeger Decl., ¶¶ 2, 3; Jaeger Depo.,[1] p. 20.

Applicable Oregon administrative rules require that tenure-track faculty members receive annual written notices that include, among other things, the employee's effective date and duration of appointment, position title, compensation, and other conditions of employment. OAR 580–021–0005(1), (2). Tenure-track faculty members must initially be appointed for one year. OAR 580–021–0110(1). The time before an institution awards indefinite tenure is known as a "probationary period," when the institution evaluates the tenure-track faculty member and considers appointment to an indefinite tenure. OAR 580–021–0100(1)(b)(A); Jaeger Decl., Exs. 1 A., p. 21; 1 B, p. 21; 1 C, p. 22. Typically, the probationary period is no less than five years, but may be shortened in special circumstances. OAR 580–021–0100(2), (4). Tenure-track faculty members have no right to reappointment or to appointment beyond the terms specified in the annual written notice of appointment. Jaeger Decl., Exs. 1A, pp. 21–22; 1B, pp. 21–22; 1C, pp. 22–23.

Generally, institutions evaluate tenure-track faculty members in the following categories: (1) instruction, (2) research accomplishments and scholarly achievements, (3) public service, and (4) institutional service. OAR 580–021–0135(2). The evaluation criteria are based on assessing the faculty member's performance "with a view to stimulating and assisting the faculty member toward improvement." OAR 580–021–0135(1)(b). As set forth in the Handbook, the University's criteria include the following:

**Instruction:** Effective teaching is an essential criterion to advancement. Under no circumstances will tenure or promotion commitment be made to one

---

1. Both parties have submitted documents with various attachments, including multiple excerpts of depositions. Unless otherwise in-dicated, all of the citations are directly to the authenticating depositions, not to the documents to which they are attached.

whose principal duties include instruction unless there is a clear documentation of ability and diligence in the teaching role[.]

\* \* \*

**Commitment to Subject Disciplines:** There is an implied obligation, to remain in the academic community, for a faculty member to reach beyond the classroom to maintain his/her competency and to contribute to the ongoing scholarly and research posture of the institution and his/her profession. In judging this commitment, the reviewer should consider points such as ... publication of significance and quality; research in progress and substantially planned work; participation in conferences ... recognized evidence of scholarliness such as special awards, scholarly citations, and the republication of work; scope and depth of scholarship as revealed in public lectures, book review, and/or in special circumstances, discussions[.]

Jaeger Decl., Ex. 2, pp. 3–4.

At the University, awarding tenure "is a significant institutional commitment to a faculty member and should be done only after careful deliberation." *Id.*, p. 8. The minimum criteria include, among other things, a demonstration of "significant contributions to teaching, a competence and willingness to participate in the work of the institution, and a productive commitment to research or scholarly activity." *Id.*

The administrative rules require the institution to evaluate the faculty member's performance in each year of the probationary period. OAR 580–021–0110(2). At the University, tenure-track faculty members receive a formal evaluation in their third year of service ("Third Year Review"), as outlined in the Handbook. Jaeger Decl., Ex. 2, p. 9. The Third Year Review period generally runs from October through April and "combine[s] the features of a continuance assessment and a prescriptive analysis in preparation for the tenure review." *Id.*; Jaeger Depo., p. 20. As part of the Third Year Review, the faculty member submits a "portfolio," which is a binder that includes the faculty member's progress in five areas: instruction, publications, community service, community outreach, and service to the institution. McNerney Depo., pp. 10–11. The portfolio is individually reviewed by all of the members of the College Personnel Committee ("CPC"), who then meet to discuss the portfolio. Evans Depo., pp. 11–13. The final step of the CPC's review is to write a letter evaluating the strengths and weaknesses of the portfolio and offering recommendations regarding the faculty member's tenure progress. *Id.*, pp. 11, 15. The CPC reviews the letter to ensure that it "says what we want it to say and the way we want to say it" before sending a copy to the faculty member. *Id.*, p. 16.

After the Third Year Review, if "continuance is not recommended, the faculty member has a one-year notice of termination." Jaeger Decl., Ex. 2, p. 9. If continuation is recommended, the next formal review is the Fifth Year Tenure Review, which runs from October through April and also includes a review of the faculty member's portfolio. McNerney Depo., p. 55; Jaeger Depo., p. 20; Lauritzen Depo., p. 76; Evans Depo., p. 16.

Though the University does not have a particular procedure for any other review, the CPC would occasionally meet and confer about the progress of tenure-track faculty members. Lauritzen Depo., pp. 83–85. The University does not require that the CPC keep minutes of its meetings. *Id.*, p. 85.

Faculty members who have received indefinite tenure may only be discharged for cause, financial exigency, or due to program or department reductions or elimina-

tions. OAR 580–021–0315(1). Discharge of tenure-track faculty members during the probationary period must comply with the notice provisions in OAR 580–021–0305, which, for faculty members in their third or subsequent year of appointment, requires at least 12–months' notice. OAR 580–021–0315(1); OAR 580–021–0305(1); *see also* Jaeger Depo., p. 100.

## II. *Siring's Employment*

The University's main campus is located in La Grande, Oregon, but it operates a number of additional locations, including one at Mt. Hood Community College ("MHCC") in Gresham, Oregon. Siring Depo., pp. 26–27. The Gresham campus houses a teacher education program known as the Curriculum for Undergraduate Elementary School Teacher Education ("CUESTE"). Lauritzen Depo., p. 40. Faculty at the Gresham campus have a slightly higher workload since it campus utilizes a two-cohort structure, as opposed to a single-cohort model, with teachers serving approximately 31 students in Gresham and 20 in La Grande. Elliott Decl., Ex. 11, ¶ 3.

### A. *Hiring Process*

Sometime in 2006, Siring interviewed with a search committee of approximately five people, including Betsy Costi ("Costi"), the Program Director for the CUESTE program in Gresham, Carol Lauritzen ("Lauritzen"), then Chair of the Education Department, and Michael Jaeger ("Jaeger"), then Dean of the Colleges of Education and Business.[2] Siring Depo., p. 28; Lauritzen Depo., pp. 23–25; Costi Depo., pp. 12–13; Elliott Decl., Ex. 11, ¶ 2. After the group interview, Siring met with Jaeger who generally discussed tenure cri-

teria and the importance of good teaching, as well as the University's general scholarship expectations for tenure-track faculty members, which would include "diverse" scholarship activities, such as writing, presentation, or even "books, curriculum, consultation." Jaeger Depo. pp. 15–16; Siring Depo., pp. 30–31. Siring inquired about the University's view of a "professor writing with students and presenting with students" because the university she was leaving did not find it as valuable as writing alone. Siring Depo., p, 31. Jaeger responded with something along the lines that "it is much more valuable and much more difficult to write with students and to work with students at a presentation than doing it by yourself or with another professor." *Id.*

After receiving the committee's recommendation and in consultation with the University Provost, Jaeger offered Siring a position as an Associate Professor of reading in the CUESTE program at the University's Gresham campus for the 2006–2007 academic year. *Id.*, p. 30, Depo. Exs. 2, 5; Jaeger Depo., p. 11. At that time, Siring was 60 years old, Costi was 59 years old, and Jaeger and Lauritzen were both 57 years old. Lauritzen Decl., ¶ 2; Jaeger Decl. ¶ 4; Costi Depo., p. 5. Around the same time, Siring learned that she had won her appeal and been granted tenure by Montana State University where she was currently teaching. Siring Depo. Ex. 1.

### B. *First Year of Employment (2006–2007 School Year)*

At the beginning of the 2006–2007 school year, Siring attended an orientation session in La Grande, where she met with

---

**2.** Some time after Siring was hired in 2006, Lauritzen was promoted to Associate Dean of the College of Education and Jaeger was promoted to University Provost. Lauritzen Decl.,

¶ 1; Jaeger Decl. ¶ 1. With the exception of the hiring process, they appear to have held those positions at all material times.

Lauritzen and Costi to generally discuss tenure requirements. Siring Depo., p. 45; Costi Depo., p. 13. According to Siring, Lauritzen described the specifics of the University's scholarship requirements for tenure as follows: during the first year while getting used to the program, she need not present at any conferences or write; during the second year, she would need to either present at one conference or publish an article; during the third year, she would be expected to either present at two conferences or write two articles; and during the fourth year, she would need to write and present an article at a conference. Siring Depo., pp. 49–50. During this discussion, no mention was made as to the quality of the publications or conferences. *Id.* Lauritzen does not recall the content of this conversation other than that a general discussion of tenure expectations. Lauritzen Depo., p. 41.

In January 2007, Siring learned that the student evaluations for one of her courses had been shared with Costi, who was not her supervisor. Siring Depo., pp. 81–83. Upset by this, Siring spoke to Lauritzen, and to Siring's knowledge, Costi did not receive any more of Siring's student evaluations. *Id.* Throughout Siring's first year of teaching, she and Costi had some minor workplace disputes, leading Siring to conclude that they did not "see eye to eye on the honesty of teaching." *Id.*, p. 83.

### C. Third Year of Employment (2008–2009 School Year)

In the fall of 2008, the University began to have concerns about Siring's teaching, scholarship, and general collegiality. Jaeger Depo., pp. 36, 48–49. These concerns were based on anonymous student complaints, administrators at the Gresham campus, and other faculty members. *Id.*, p. 49.

On September 16, 2008, Siring and Lauritzen met to discuss Siring's upcoming Third Year Review. Siring Depo., pp. 60–61, Depo. Exs. 6–7. The meeting lasted no more than an hour and consisted mostly of Lauritzen providing Siring information about how to prepare her "framing statements" for her portfolio due on November 17, 2008. Siring Depo., p. 61, Depo. Ex. 6, p. 2, Ex. 7, p. 1. Siring took detailed notes about these suggestions. *Id.*, Ex. 7. They also discussed in detail Siring's teaching and scholarship, including why she appeared to have experienced a decline in scholarship since coming to the University. Siring Depo., pp. 61–62. Siring explained that the primary reason for the decline was a difference between the two schools' programs and her responsibilities in those programs. *Id.*, pp. 62–63. Lauritzen suggested that Siring explain these differences in detail during her Third Year Review in order to address the decline in scholarship. *Id.*, p. 64. At the time, Siring did not consider these suggestions as areas of concern, but rather how to best present her portfolio. *Id.*, p. 66.

On October 6, 2008, as part of Siring's Third Year Review, Professor Ruth Davenport ("Davenport") observed Siring in the classroom, noting several areas that could use improvement. *Id.*, p. 105, Depo. Ex. 15. Siring received a copy of Davenport's observations on October 27, 2008. *Id.*

On November 17, 2008, Lauritzen wrote a comprehensive evaluation of Siring's classroom style observed over the previous three years, providing a detailed review of her strengths and weaknesses. Siring Depo. Exs. 10–11. Lauritzen gave Siring an opportunity to "write a response" to include in the portfolio, which Siring did, including addressing the criticism about her use of time in the classroom and clearly stating the learning objectives. *Id.*, Ex. 10.

The following members of the CPC reviewed Siring's portfolio: (1) Lauritzen, Associate Dean for the College of Education; (2) Darren Dutto ("Dutto"), Chair; (3) Allen Evans ("Evans"), College of Education; (4) Jeff Vermeer ("Vermeer"), College of Business; (5) Lee Ann McNerney ("McNerney"), College of Education; and (6) Emily Booth ("Booth"), student. Siring Depo. Ex. 8, pp. 3–4. The CPC had two main points of concern: (1) the "rigor of instruction," and (2) "scholarly activity, commitment to discipline." Evans Depo., pp. 14–15. The Third Year Review letter dated January 7, 2009, recommended that Siring "be continued," though it emphasized that "she will want to be attentive to the improvement of instruction as well as her scholarly endeavors in order to achieve tenure." Siring Depo. Ex. 8, p. 2. The relevant portions of that letter state as follows:

### Instruction

Commendation: Dr. Siring has had to prepare a large number of new courses both in the overall teacher preparation program and in the literacy course of study. She has been diligent in meeting the demands for delivering these courses. Her passion for literacy, particularly in the area of children's literature, is evident. Dr. Siring has good rapport with her students and demonstrates a caring attitude toward them. She is reliable in meeting her classes at the designated times and is sensitive to the needs other students in the late afternoon time period. She develops a positive feeling tone and students seem to enjoy attending class.

Recommendation: Because teaching is the most important aspect of a professor's responsibilities, Dr. Siring needs to be attentive to the quality of her teaching. In addition to continuing to be a positive instructional role model, Dr. Siring needs to increase the rigor of her classes to ensure students gain needed knowledge and skills. An important aspect for improvement is the productive use of class time. Dr. Siring needs to ensure that instructional time is used most effectively to develop concepts and content. Another aspect would be to make sure classes are focused on critical concepts and processes. One indicator of increased instructional quality and rigor would be improved scores on the Reading Specialist PRAXIS.

### Commitment to Discipline

Commendation: Since coming to Eastern, Dr. Siring has presented at local and state conferences three times, often involving students in her presentations. At this time, Dr. Siring has several publications in the planning stages.

Recommendation: Dr. Siring is encouraged to continue with conference presentations. However, she needs to find a research area and have at least one article published or accepted and scheduled for publication in a reputable journal at the time of her next review.

Siring Depo. Ex. 8, pp. 1–2.

It also included suggestions in the areas of "Contributions to the Institution" and "Outreach," including that Siring "consider serving on other University committees when she has met the expectation for scholarship" and "find additional ways to act professionally such as providing in-service to local schools or consultation with local libraries." *Id.*, p. 2.

At the time Siring submitted her portfolio for the Third Year Review, she listed several publications as "in progress." Siring Depo., p. 89, Depo. Ex. 12, p, 8. One of those publications, "Life in Literature," was published in the ORAcle journal's Spring 2009 issue. *Id.*, pp. 91–92; Elliot Decl., Ex. 8. However, Siring later learned this was not a peer-reviewed publication. Siring Depo., p. 92.

Siring signed her Third Year Review letter during a meeting with Lauritzen in March 2009, but backdated it to January 7, 2009, at Lauritzen's request. *Id.,* pp. 76–77. Siring thought that, overall, the letter reflected that she was making satisfactory progress, especially in light of the information she initially received about tenure requirements from Lauritzen in 2006. *Id.,* pp. 93–94. However, Siring did recognize that she needed to make progress with her teaching and scholarly development in order to achieve tenure. *Id.,* pp. 9, 103–105. Siring did not receive a copy of this letter or her evaluation materials until May 17, 2010. Elliott Decl., Ex 11, ¶ 2.

Sometime in July 2009, Lauritzen asked all the CUESTE faculty members to summarize their accomplishments, including their presentations and publications for the 2008–2009 school year. Lauritzen Depo., p. 76, Depo. Ex. 78. Siring responded that she had published one article, presented at one conference, and had been focusing on the "community involvement in the schools." *Id.,* p. 80, Depo. Ex. 78. At this time Lauritzen first informed her that, in order to impress the CPC for tenure, she needed to write an article that was published in a peer-reviewed journal and would have to attend national or international conferences. *Id.;* Siring Depo., p. 112. Specifically, Lauritzen responded as follows:

I can tell that you were active in many things but we need to confer about what you are going to need to do this year to get tenure. Your publication listed as ORATE—is that the ORAcle (ORA's newsletter) or a different place[?] In any case, these are not peer-reviewed and you must have something peer-reviewed. I also think your presentations at basically the local level are not going to be enough. So you need to plan for how to be successful in this next review. Lauritzen Depo. Ex. 79, p. 1.

In response, Siring inquired about presenting in other states beside Oregon, to which Lauritzen responded that "the writing/publication is the very most important thing you can do[,]" and should make it "a priority." *Id.,* p. 81, Depo. Ex. 79, p. 2; Siring Depo. Ex. 14. Lauritzen later acknowledged that the Handbook did not require that publications be peer-reviewed or that conference presentations be made in any particular location. Lauritzen Depo., p. 81. After this email exchange, Siring first "knew what [she] had to do so [she] could progress" in the areas of publications, presentations, and scholarship to avoid being "in trouble" for her Fifth Year Review. Siring Depo., p. 115.

**D. *Fourth Year of Employment (2009–2010 School Year)***

Sometime in the fall of 2009, Lauritzen mentioned Siring's tenure progress to the CPC as part of a "conversation about those people who were past their Third Year Review and not yet in their tenure review." Lauritzen Depo., pp. 83–85. No records were kept regarding this meeting pursuant the University's normal practice. *Id.,* p. 85.

On October 13, 2009, Siring received a response regarding her article "The Story in Me: Connecting Life with Literature" which she had submitted to The Dragon Lode, a peer-reviewed publication. Siring Depo., p. 106, Depo. Ex. 16. Though the journal thought that the article had promise, "without considerable rewriting, revisions, and editing," it declined to publish it at that time. *Id.* Siring revised and resubmitted the article two more times, but she never resubmitted it to the Dragon Lode because her last revision "was her last year" and she was out on medical leave for

one term; the article was published in two other journals, neither of which is peer-reviewed. *Id.*, pp. 106–07.

On December 8, 2009, Costi created a written report documenting a conversation she had with two students who were concerned about Siring. Jaeger Depo. Ex. 52; Costi Depo., pp. 68–70. The students reported a recent incident with Siring where things got "really bad," prompting them to seek assistance to get Siring "the help she needs." Jaeger Depo. Ex. 52. The report included a recollection of several strange behaviors, a belief that Siring smelled like alcohol, her office smelled like alcohol, and a concern that she might have a drinking problem. *Id.* Costi personally believed that Siring "does not have a drinking problem" and also mentioned that Siring took painkillers for a bad back and neck and also often had migraines. *Id.* Costi informed Lauritzen of the students' concerns and her personal belief that Siring did not have a drinking problem, but not that Siring had been taking pain medication. *Id.* Lauritzen thanked Costi for giving her a "head's up." *Id.*

After the July 2009 email exchange, Lauritzen and Siring did not otherwise communicate about Siring's status or tenure progress until Lauritzen performed a classroom observation on February 22, 2010. Lauritzen Depo., p. 89; Siring Depo. Ex. 17. The classroom observation was part of the follow-up to the recommendation from the Third Year Review's about improving classroom instruction. Lauritzen Depo., p. 91. After the observation, Lauritzen discussed with Siring what could be improved, as well as her progress on "the presentations and the writing." Siring Depo., pp. 107–08. Lauritzen sent Siring her written evaluation of the lesson "a couple months later," consistent with the discussion after the observation. *Id.*, p. 108, Depo. Ex. 17. It stated in part:

> Overall, the content of the class did not seem to be moving students toward learning the necessary information nor meeting the course outcomes. At times, the instructor did not clearly communicate ideas and concepts. Class time was not used productively as most of the activities completed in class could just as easily have been done as homework.

*Id.*, Ex. 17, p. 2.

During this discussion, Siring mentioned to Lauritzen that the "new" tenure requirements regarding peer-reviewed publications and out-of-state conferences were not mentioned to her when she was hired in 2006, to which Lauritzen replied that "things change." Siring Depo., pp. 112–13; Lauritzen Depo., pp. 91, 93. Lauritzen also indicated that if Siring did not do these things, she would have difficulty being granted tenure, but that if she did not take on the extra work to make tenure, she would have more time to spend with her grandchildren. Siring Depo., p. 113.

In March 2010, in connection with submitting paperwork for the elementary education major, Lauritzen asked the faculty to send her information for their last three years of publications, presentations, professional development or working with teachers/school districts, and the amount of any grants received. Lauritzen Depo. Ex. 86. Siring responded as follows:

> Ok, Carol, I have presented each year, and have written each year. All of these have been with my students, since I want to encourage and help them in their professional development. It doesn't do much for me. I am on the Board of Directors for the local reading council. I have not applied for any grants. I am spending my time working with my students. I need to talk to you personally re my future. I don't want to do a lot of things that do not allign [*sic*] with my objectives as a professor at this

point ... So, contact me re email or we can talk ... Carol, by the way, my grandchildren are on the East Coast so no matter what happens with my position, I will not be spending any more time with them. (I am writing this since it was a little upsetting to me that you suggested that I would be able to spend more time with them at our last meeting.)

*Id.*

Within minutes, Lauritzen responded as follows: "Oh, Rosy, I didn't mean to upset you about your grandchildren. My friends who have grandchildren love the time with them and I was just making what I thought was a friendly comment—absolutely no negative meaning intended." *Id.*

On May 3, 2010, Siring sent a letter to Costi, stating that she would not be teaching any summer courses that year "[b]ecause of the following: (1) health, (2) tenure, and (3) additional work [in] summer and fall." Siring Depo., pp. 138–39, Ex. 20. Siring later elaborated on some of these reasons, stating that she needed to focus on tenure over the summer, including writing and applying to present at an appropriate conference, including a conference that had a presentation proposal deadline of June 10, 2010. *Id.*, p. 139.

In light of the "poor quality" of the February 2010 observation, Lauritzen became increasingly concerned about Siring's ability to improve her teaching and scholarship, leading her to consider not continuing Siring on the tenure-track. Lauritzen Depo., pp. 99–100, 105; Jaeger Depo., pp. 72–73. Consequently, she determined that Siring needed an additional classroom observation. Lauritzen Depo., p. 98. She asked Jaeger, who was now the University Provost, to accompany her since he had more experience with personnel issues. *Id.*, pp. 99–100.

Lauritzen arranged that classroom observation on May 17, 2010. Siring Depo.,

p. 120. Despite Siring's belief that it would be a formal observation, it instead turned out to be an "attendance," where no notes were taken and Provost Jaeger was also present, though she was unaware that he would be attending. *Id.*, p. 122. Siring thought that the class went "great." *Id.*

Instead of discussing Siring's classroom performance, Jaeger began discussing Siring's progress toward tenure, including her writing, publications, research agenda, and conference presentations. *Id.*, pp. 122–23; Elliott Decl., Ex 11, ¶ 5. Siring recalls Jaeger stating that he did not feel that she was making sufficient progress and that the CPC would not recommend her for tenure since she needed to present at national, not state, conferences and her articles needed to be published in peer-reviewed journals. Siring Depo., pp. 124–25, 131. In response, Siring told Jaeger and Lauritzen that she believed that the University had "misrepresented" the tenure requirements when she was hired. *Id.*, pp. 125, 129–30. Siring did admit that her preference was not to write, but that she "did it anyway." *Id.*, p. 134.

Siring also recalls that Jaeger attempted to dissuade her from applying for tenure, telling her that it would be a lot of work for her to make tenure and that it was not worth the trouble. *Id.*, pp. 124–25. When she explained that she was in the process of completing an article for publication, Jaeger discouraged her from completing it. Elliott Decl., Ex 11, ¶ 5. When Siring insisted that Jaeger review her research article, he reluctantly agreed to do so, telling her "you can send me what you are working on and I will look at it and make suggestions, but it doesn't look like success. Why go through the process? Save yourself the trouble." *Id.*

Jaeger contends that the conversation was not about tenure, but about whether Siring's employment would be continued

past the end of the school year. Jaeger Depo., pp. 94, 96. They did discuss Siring's scholarship, but in the context of whether she would be able to have an article published in time to include in her Fifth Year Review portfolio due on approximately October 15, 2010. *Id.*, p. 94. When asked whether he was attempting to dissuade Siring from sitting for tenure, Jaeger responded as follows:

Again, that was not her choice. That was our choice. My concerns and advice were, did she have the scholarship and ARC performance that would ultimately find us with a portfolio in October that would lead to tenure. If she was not willing to put that work in or couldn't put that work in, then [he] would recommend that she not go forward. That was not her decision, that was the University's decision.

*Id.*, p. 96.

At some point, Jaeger asked Siring how long she planned to work and expressed surprise when Siring responded that she planned to work for an additional five years, noting that he thought she would be thinking about retirement. Siring Depo., p. 125. Jaeger questioned Siring about her long-term plans because retirement was a common discussion at that time among the faculty. Jaeger Depo., pp. 92–93. According to Siring, Jaeger also inquired as to whether her health would prevent her from teaching summer classes. Siring Depo., p. 137. In response, Siring explained that she decided not to teach summer courses largely in order to work on her writing and apply for tenure in the fall. *Id.*, pp. 138–39.

Before the meeting concluded, Jaeger also asked Siring whether she had made a decision about applying for tenure, to which she responded that she did not feel like she had any choice in the matter. *Id.*, p. 131. Siring felt as though the decision to dissuade her from pursuing tenure had

already been made even before the classroom observation. Elliott Decl., Ex 11, ¶¶ 7–8. Because she believed that she would not be fairly considered for tenure, Siring initially decided to drop her efforts and not apply. Elliott Decl., Ex 11, ¶ 8. Jaeger told Siring to let them know her final decision regarding pursuit of tenure, though he did not give her a specific deadline. Lauritzen Depo., p. 127. He also told her that "he would make this [her] last year," that she would be "given a terminal contract," and that he would "make it as easy as possible" for her, even suggesting taking away some of her responsibility with regard to student teachers during spring term 2011. Siring Depo., p. 132.

At the end of the discussion, both Lauritzen and Jaeger mentioned that they thought that the lesson they had observed that day was very good and the students were engaged, though Jaeger wondered why Siring did not make more use of the overhead projector. *Id.*, p. 133. Siring was never provided a copy of an observation summary for this meeting. Lauritzen Depo., p. 143.

After the meeting, Lauritzen and Jaeger discussed feeling "a little saddened that [Siring] was feeling so distraught[,]" but that the "best thing for [the] students and the best thing for [the] program as to end this faculty member's time with [the University]." *Id.*, p. 112. Immediately after returning to her office that same day, Lauritzen set about scheduling a meeting with the CPC to discuss Siring's continued employment and possible placement on a terminal contract at the end of the year, which was her fourth year at the University. *Id.*, p. 127. Even though Jaeger had given Siring some time to inform them of her final decision, Lauritzen did not wait for Siring's response because she had "al-

ready determined what [her] recommendation would be." *Id.*

An internal memo from Costi to Jaeger references an incident that occurred on May 18, but does not indicate when the document was written or sent to Jaeger. Although it does not indicate the year, all parties treat this document as dated in 2010. Jaeger Depo. Ex. 61, p. 1. It contains Costi's observations during a meeting to finalize graduation logistics where Siring was "very loud and interrupted frequently," appeared "unsteady," was unable to sit in her seat "without sitting on the armrest first as she navigated to her actual seat," and which prompted at least three faculty members to inquire whether she was intoxicated. *Id.*

Despite feeling pressure to abandon her efforts for tenure, Siring took several days to consider her options after the May 17 meeting, including talking it over with her daughter who is a law school dean on the East Coast. Siring Depo., p. 144. On May 24, 2010, Siring wrote a letter addressed to Jaeger, and copied to Lauritzen and then University President Bob Davies, protesting the efforts to pressure her to give up her tenure application, noting the age-related comments made by Jaeger, advising that age-based efforts to dissuade her were unlawful, informing them of her decision to apply for tenure and demanding that she be fairly considered without regard to her age. *Id.,* pp. 148–49, Depo. Ex. 21. There is some confusion regarding the manner in which the letter was sent. Siring recalls that she faxed the letter to Jaeger, Lauritzen, and Davies the morning of May 24 (Siring Depo., pp. 147–49), but also submits evidence that she sent it by fax to Jaeger and Davies only, with followup by mail to Jaeger, Davies, and Lauritzen (Elliott Decl., Ex. 9 p. 2). Lauritzen does not recall how or when she received the letter, but contends that she did not read it before deciding to place

Siring on a terminal contract. Lauritzen Depo., p. 123; Lauritzen Decl. ¶ 3.

On Sunday, May 23, 2010, Costi responded to an email from Lauritzen about a matter wholly unrelated to Siring. Costi Depo., p. 78, Depo. Ex. 100. At the end of her email she added that earlier that week, on Tuesday May 18, she had observed Siring at work appearing "very high on drugs," and that same evening she "added booze to the equation and was so drunk she asked LeAnn [McNerney] to lead the class for her as it was supposed to be her turn. She smelled like a distillery." *Id.* In apparent reference to the December 2009 report she received from two students about Siring's alleged alcohol use, Costi noted that "[t]he students were right and I was wrong. I just didn't think she drank substantially." *Id.*

### E. *Terminal Contract*

When the CPC met at noon on May 24, 2010, Lauritzen expressed her concerns and recommended that the University discontinue Siring's employment. Lauritzen Depo., p. 129; Evans Depo., pp. 24–25. In addition to Lauritzen, at least three members of the CPC were present, most likely Evans, Dutto, and Vermeer. Evans Depo., pp. 25–26. The CPC reviewed the letter summarizing the results of Siring's Third Year Review. *Id.,* pp. 21–23. The meeting lasted approximately 15 to 20 minutes and was fairly "straightforward," with Lauritzen expressing concern that Siring had not made significant improvement since her Third Year Review, and consulting with the other members about whether Siring should "move to a terminal contract" or whether the University should "allow the Fifth Year Review to take place." *Id.,* pp. 26–31. Placement on a terminal contract meant that Siring would be allowed to teach for an additional school year, after which time, her employment

with the University would end. *Id.*, p. 27. After asking brief questions about Siring's teaching and scholarship, the CPC members present agreed that Lauritzen's proposal was reasonable. Lauritzen Depo., pp. 124–25, 134–35; Evans Depo., pp. 28–31. Several days later, Lauritzen made a formal recommendation to Provost Jaeger. Jaeger Depo. Ex. 58.

Jaeger read Siring's May 24, 2010 letter sometime after receiving the recommendation of Lauritzen and the CPC. He then drafted a letter of non-continuance. *Id.*, p. 117. Though Jaeger does not recall when he drafted the letter, he did not consider extending the time in which Siring could apply for tenure. *Id.*, pp. 117–18. Jaeger did not consult with the University's President about a possible extension of the probationary period as permitted by the administrative rules because he felt that "the case was well made that her performance and the portended performance would not meet standards." *Id.* Jaeger understood prior to the May 24 CPC meeting that "Lauritzen already had a notion that [*sic*] she was going to recommend to the CPC. CPC met, they made a recommendation. I knew that recommendation before I read or took into account anything that was in [Siring's May 24] letter." *Id.*, p. 137.

On May 25, 2010, Jaeger sent an email updating several University officials on the status of two tenure-track professors, including Siring, as follows:

> As a follow-up to the third year review (much like that of [the other employee mentioned in the email] ), the dean and CPC examined the review requirements and then re-examined Professor Siring's progress. Unlike the former case, Professor Siring has made no significant progress on several fronts: a) Her scholarship is not on track. There are no publications, in review or in the writing stage. She confesses to not wanting to write and admits to not having a passion or even interest in writing[;] b) Her teaching continues to suffer. Classroom reviews are poor and student complaints mount[;] c) And, most concerning are the comments and reports of students, MHCC partners, and our other faculty at MHCC. I will not describe the nature of these reports, but rather just say that they are, in themselves, of enough substance to effect [*sic*] the aim of this personnel action.
>
> The Dean and CPC have recommended that Professor Siring not be renewed. Although uncommon, this is not without precedent and is with the rights of the University under [OAR 580–021–0110]. A review may be conducted each year and a determination made as to continuation.
>
> The dean and I have met with professor Siring and informed her that this was the action that would be taken. She will have a one-year notice starting in September until next June 15th.
>
> As soon as I have the documentation I will send a copy of both personnel actions.

Jaeger Depo., Ex. 55.

Jaeger states that he "had no understanding or knowledge that alcoholism was involved" in the decision-making related to Siring's employment. *Id.*, p. 143.

On May 28, 2010, Lauritzen sent Jaeger a letter with the CPC's written recommendation regarding Siring's appointment. *Id.*, Ex. 58. The letter noted that the CPC had met to review Siring's fourth-year progress, and that after her Third Year Review, Siring had been given "specific feedback about the quality of instruction and scholarship." *Id.* Because Siring "has not made sufficient progress in these areas," Lauritzen and the CPC recommended that she "not be continued in her appointment." *Id.*

Siring did not hear from anyone at the University until she found the termination letter dated May 28, 2010, on her desk right before graduation. Siring Depo., pp. 149–50, Depo. Ex. 22. The letter stated that the CPC and Lauritzen had determined that because Siring was not making sufficient progress in the areas of "quality of instruction and scholarship," her appointment would not be continued, and she would be offered only a one-year terminal contract beginning September 16, 2010, and ending June 15, 2011. Elliott Decl., Ex 11, ¶ 9; Siring Depo., Ex. 22. Upon reading the letter, Siring was "shocked" since she had so recently informed the University of her renewed intention to pursue tenure. Siring Depo., pp. 150–51.

On June 11, 2010, Costi sent a memo to Jaeger that at the graduation ceremony, she smelled alcohol on Siring's breath and observed that she was "pacing jittery-like" and forgot where her assigned seat was located or what she was supposed to do during the ceremony. Jaeger Depo. Ex. 61, p. 2. McNerney recalled that at some point during the graduation festivities, Costi whispered to her that Siring smelled of alcohol. McNerney Depo., p. 66. McNerney nodded in acknowledgement; even though she had not smelled alcohol on Siring that day, she had noticed "slurred speech" a few days earlier after Siring learned she had not been "promoted." Id., pp. 67–68.

Siring gave her Tort Claim Notice on July 23, 2010, and filed her initial complaint with the Oregon Bureau of Labor ("BOLI") Civil Rights Division on July 27, 2010. Elliott Decl., Ex 12; Siring Depo. Ex. 24. On November 5, 2010, Siring filed an amended BOLI complaint. Elliott Decl., Ex 11. On November 8, 2010, the University's Legal Services Department received a letter from Siring's attorneys, advising that Siring had added a claim based on the University's "erroneous perception" that Siring was disabled on account of an alcohol problem. Elliott Decl., Ex 12.

### F. Fifth Year of Employment (2010–2011 School Year)

Throughout the fall and winter of 2010, Siring recalls that, other than attending staff meetings, she was excluded from almost all faculty decision-making. Siring Depo., pp. 163–64. On December 29, 2010, Siring broke her neck, which necessitated surgery and prevented her from working for the 2011 winter term, though she was still paid during this time period. Id., p. 172. Though Jaeger told her that the University would keep her informed regarding her students while she was out on leave, this did not happen. Id., p. 173. Jaeger was otherwise cooperative regarding Siring's situation. Id. Costi recalls Jaeger telling her that Siring was "on medical leave. Let her heal." Costi Depo., p. 37.

Sometime prior to the start of spring term 2011, Siring learned by email that the next staff meeting would be on March 8, 2011, and that she would not be supervising the student teachers that spring. Siring Depo., pp. 173–75. Siring found this meeting "humiliating," in part because when she arrived, Costi told her she should not be there. Id., p. 174. After writing a letter to Jaeger, Siring was permitted to teach the student teachers that spring, but was assigned to supervise a student in McMinnville which required a lengthy commute. Id., pp. 175, 186. Siring was troubled by the fact that she was not involved in the decision regarding student teacher placement as she had been in previous years. Id., p. 175. Though the student teaching seminar was scheduled for March 17, 2011, and was an event that Siring attended every year, Costi changed the date to March 10, 2011, apparently

without informing Siring of the change. *Id.,* pp. 177–78. Siring ended up attending the seminar because it was rescheduled to the original date of March 17, presumably due to an electrical problem which caused the campus to be closed on March 10. *Id.,* p. 179. Siring believes that the change was directed at her since Costi no longer kept her informed. *Id.*

On March 31, 2011, Dennis Hopwood ("Hopwood"), the University's Human Resources Director, contacted Costi because Jaeger had informed him of Costi's report that Siring appeared to be under the influence of alcohol during a meeting the previous day. Costi Depo., Ex. 108. Hopwood said he had been involved in the "legal aftermath of the decision to award Rosemary Siring a terminal contract" and was "aware of the sidebar issue with Siring." *Id.* In her response, Costi expressed concern that "in Oregon, if a person is identified as having alcohol/drug problems then they have rights to 'rehabilitation' and this might interfere with the terminal contract situation." *Id.* Costi inquired as to whether it would be appropriate to "jeopardize the terminal contract by introducing the drug/alcohol situation." *Id.* After discussing her past experience with teachers using drugs/alcohol at work, Costi had "no doubt in [her] mind that [Siring] is using a mixture. She has shown me her different medicines and I smell the alcohol. We all know that the introduction of drug/alcohol suspicion will be challenged and the entire situation will escalate." *Id.*

Later that afternoon, Hopwood sent Jaeger an email titled "confidential." Jaeger Depo., Ex. 67. Hopwood summarized his advice to Costi as follows:

1. She should meet with Rosemary Siring as soon as possible and confront her with the behaviors that she (Betsy) observed on Tuesday, March 29, and the behaviors others (John Crooks, LeAnn McNerney) observed on Monday and Tuesday, March 28 and 29 and mentioned to Betsy. Specifically, those observable symptoms of being under the influence of alcohol and/or drugs included: smell of alcohol, slurred speech, disorientation/imbalance, incoherence (inability to speak in logical flow).

2. Betsy should ask Rosemary if she'd been drinking before coming to class or during class.

3. Irrespective of Rosemary's answer, Betsy should tell Rosemary that teaching under the influence of substances is inappropriate and a violation of University policy. She is giving Rosemary an oral reprimand and expects the behavior to stop. If it continues, it will result in discipline procedures.

4. Betsy should tell Rosemary that she's going to document her observations of Rosemary's behavior, the observations of others, and this conversation for the record. She will provide Rosemary with a copy and will place a copy in her (Betsy's) own file. At this time, the documentation will not go to HR or be placed in Rosemary's file.

5. Betsy should encourage Rosemary to seek help for any chemical dependency she may have.

For the future . . .

I told Betsy that if Rosemary shows up under the influence in the future, that she must intervene, pull her out of the classroom, confront her with her observations of Rosemary's behavior, and send her home, preferably in a cab.

I further told Betsy that the existence of Rosemary's tort claim and BOLI complaint should not prevent us from pursuing the sort of performance coaching and intervention that we would take in similar circumstances with any other employee.

*Id.*

Costi responded that such actions were not in her job description since she is a

"less than half-time glorified secretary" and that she would not give Siring a reprimand or otherwise confront her. Costi Depo., p. 108. Issues concerning alcohol were never raised with Siring during her employment at the University. Siring Depo., p. 184.

Toward the end of the 2011 spring term, McNerney administered the student evaluations for a course that she taught with Siring. *Id.*, p. 182. Though Siring saw McNerney collect the completed evaluations and later asked to see them, Costi responded that no student evaluations were completed for that course. *Id.*, pp. 182–83.

Siring was asked to present the special awards for the graduating seniors in her cohort at the spring graduation ceremony. *Id.*, p. 181. However, when she arrived to pass out the awards, Jaeger and McNerney were already presenting them to the students. *Id.*, pp. 181–82.

At some point toward the end of the term, Costi was informed by Human Resources that June 15, 2011, was Siring's last day and was asked to "make sure [to] get her keys from her." Costi Depo., p. 42. When Costi attempted to do this, Siring responded in a hostile manner, insisting that she was working until June 30. *Id.*, pp. 42–43. A few days later, Siring sent Jaeger an email telling him where she had left her syllabi and all of the textbooks, noting that she did not know what Costi or any of the other staff wanted from her, since they were not speaking to her, and any attempts she made to give them information about her courses was ignored. *Id.*, Ex. 24. Jaeger forwarded Siring's comments to Costi, who responded that Siring "is correct. We did mostly treat her like an elderly aunt who is only partly coherent." *Id.* Siring's last day at the University was June 30, 2011.

## FINDINGS

Siring alleges that the University discriminated against her on the basis of age and disability and also took retaliatory actions against her for making a complaint of age discrimination and filing a Tort Claim Notice and BOLI complaint. The University seeks summary judgment in its favor, arguing that the undisputed facts establish that did not engage in any discriminatory or retaliatory behavior.

## I. *Age Discrimination (First and Second Claims)*

■ Siring alleges claims for age discrimination in violation of the ADEA and Oregon law. The Ninth Circuit analyzes ADEA discrimination cases using the framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for reviewing claims brought under Title VII of the Civil Rights Act of 1964. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141–42, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (collecting cases from other circuits); *Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 456 (9th Cir.1995). Courts apply the same *prima facie* standard to federal and state claims for disparate treatment, including claims arising under the ADEA. *See Henderson v. Jantzen, Inc.,* 79 Or.App. 654, 657, 719 P.2d 1322, 1324, *rev denied,* 302 Or. 35, 726 P.2d 934 (1986) (adopting U.S. Supreme Court's formulation of *prima facie* case). When the district court has supplemental, rather than diversity, jurisdiction over the state discrimination claims, the *McDonnell Douglas* burden-shifting framework applies to both the federal and state discrimination and retaliation claims. *Dawson v. Entek Int'l,* 630 F.3d 928, 934–35 (9th Cir. 2011); *see also Shepard v. City of Portland,* 829 F.Supp.2d 940, 953–54 (D.Or. 2011); *Ahmed v. Mid–Columbia Med.*

*Center,* 673 F.Supp.2d 1194, 1207 (D.Or. 2009).

The plaintiff carries the initial burden to establish a *prima facie* case of discrimination. *Lindahl v. Air France,* 930 F.2d 1434, 1437 (9th Cir.1991), citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. To meet that burden, the plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, either through the *McDonnell Douglas* framework or with direct evidence of discriminatory intent. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003) (citation omitted). The requisite degree of proof necessary for a plaintiff to establish a *prima facie* case on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994) (citation omitted).

Direct evidence of discrimination is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem–Keizer Yellow Cab Co.,* 389 F.3d 802, 812 (9th Cir.2004), *cert denied,* 544 U.S. 974, 125 S.Ct. 1837, 161 L.Ed.2d 724 (2005) (internal citations omitted). "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Vasquez,* 349 F.3d at 640, quoting *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir.1998).

Under *McDonnell Douglas,* a plaintiff may establish a *prima facie* case of age discrimination by demonstrating that she: (1) belongs to a protected class; (2) was performing her job satisfactorily; (3) was discharged; and (4) either (a) was replaced by a substantially younger person with equal or inferior qualifications, or (b) if the plaintiff was discharged as part of a reduction of the work force, that the discharge occurred under circumstances giving rise to an inference of age discrimination. *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 917 (9th Cir.1996), *cert denied,* 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). If a plaintiff establishes a *prima facie* case, then the burden shifts to the defendant who must proffer a legitimate, nondiscriminatory reason for its employment decision. *Diaz v. Eagle Produce Ltd. P'ship,* 521 F.3d 1201, 1207 (9th Cir.2008); *Godwin,* 150 F.3d at 1220. This is merely a burden of production as the ultimate burden of persuasion remains with the plaintiff at all times. *Chuang v. Univ. of Cal. Davis, Bd. of Trs.,* 225 F.3d 1115, 1123–24 (9th Cir.2000).

If the defendant provides a legitimate reason for the employment action, then the plaintiff must show that the defendant's proffered reason is pretextual. *Diaz,* 521 F.3d at 1207. Pretext may be established in one of two ways: "(1) indirectly by showing that defendant's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang,* 225 F.3d at 1127. "When that evidence, direct or circumstantial *consists of more* than the [*prima facie* ] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason[,]" but "where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination ... plaintiff has failed to raise a triable issue of fact." *Wallis,* 26 F.3d at 890 (internal quotations, citation omitted) (emphasis and brackets in original). That is, the plaintiff must do more than simply "establish a *prima facie* case and deny the credibility of [the defendant's] witnesses." *Id.* (citation omitted).

## A. *Prima Facie Case*

### 1. *Direct Evidence of Discriminatory Intent*

Siring contends that she has direct evidence of discriminatory intent sufficient to establish a *prima facie* case of age discrimination. In support, Siring points to two age-related comments made by Lauritzen and Jaeger in the months leading up to the May 2010 decision to place her on a terminal contract.

The first comment occurred in February 2010 after Lauritzen observed one of Siring's classroom lessons. When discussing her observations and Siring's research and conference attendance progress, Lauritzen first informed Siring that she needed to attend an out-of-state conference and publish in peer-reviewed publications. After Siring expressed surprise at these "new" requirements, Lauritzen indicated that if Siring did not take on the extra work, she would have more time to spend with her grandchildren. Though the comment troubled her at the time, Siring did not mention anything to Lauritzen until March 2010, in response to another inquiry from Lauritzen about Siring's publication and professional development progress.

The second age-related comment was made by Jaeger during the May 17, 2010, meeting. Siring recalls Jaeger asking her about her retirement plans, expressing surprise that she planned to work for five more years, and also inquiring about her health in connection with her plan to not teach summer courses that year.

Siring also points to Costi's later admission to Jaeger that she treated Siring during her last days of work "like an elderly aunt who is only partly coherent."

■■■ Siring contends that these remarks provide direct evidence that the University was making discriminatory employment decisions on the basis of her age.

"The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.'" *Hartung v. Cae Newnes, Inc.*, 229 F Supp2d 1093, 1100 (D.Or.2002), quoting *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir.1990). Comments that are "very general and [do] not relate in any way, directly or indirectly, to the termination[ ] of [the plaintiff]," are insufficient to create an inference of discriminatory motive sufficient to defeat summary judgment in the employer's favor. *Nesbit v. PepsiCo, Inc.*, 994 F.2d 703, 705 (9th Cir.1993). However, when decision-makers make discriminatory remarks "regarding assignments, promotions, or policies ... the remarks [are] certainly relevant and, along with other substantial evidence, create[ ] a strong inference of intentional discrimination." *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1477 (9th Cir.1995). Such remarks included "we want fresh blood" and "older employees, unfortunately don't take advantage of all the opportunities" because they expressed a preference for youth in deciding assignments, promotions, or policies. *Id.*; *see also Turcotte v. ABM Janitorial Servs.*, No. CV 10–345–MJP, 2011 WL 1154486, at *3 (W.D.Wa. Mar. 25, 2011) (concluding that a supervisor's comment that "because of [plaintiff's] age, [she] would be able to retire and collect [her] Social Security," made during a meeting called to discuss plaintiff's termination, was enough to defeat summary judgment).

The remark by Costi had nothing to do with Siring's job performance and was made long after Siring was placed on a terminal contract. Therefore, it does not constitute direct evidence of age discrimination.

In contrast, Lauritzen's remark about Siring's grandchildren was made in con-

nection with discussing Siring's progress on the tenure requirements. That discussion, following a teaching observation, can reasonably be considered a form of a performance evaluation, albeit a relatively informal one. Similarly, Jaeger's remarks during the May 17, 2010 meeting following another teaching observation concerned an employment decision, namely whether to continue Siring on to the Fifth Year Tenure review or to provide her a terminal contract that would effectively end her employment.

However, it is far less clear whether Lauritzen's and Jaeger's remarks give rise to the reasonable inference that the University was taking Siring's age into account when determining whether to continue her tenure-track employment. The age-related inference drawn by Siring is not the only possible inference. Lauritzen's remark about grandchildren does not in any way express a preference for youth over age with respect to job performance, but simply notes that the time needed to meet the tenure requirements could be spent on other activities. The desire to spend time with grandchildren may be the province of older persons, but is presumably one of the ways that Lauritzen knew Siring preferred to spend her free time. Similarly Jaeger's later remark about Siring's health was made in direct response to her proffered excuse for not teaching summer courses and has nothing to do with Siring's age. In contrast, Jaeger's inquiry about Siring's retirement plans necessarily concerns Siring's age. However, Jaeger offered a reasonable explanation for his inquiry based on a common discussion at that time among all faculty. Furthermore, Jaeger was nearly the same age as Siring and likely had begun to plan for his own retirement.

In order to satisfy her *prima facie* case by way of direct evidence, the remarks would need to "prove[ ] the fact of discriminatory animus without inference or presumption." *Vasquez,* 349 F.3d at 640 (quotation omitted). Because the statements made by Lauritzen and Jaeger are subject to two different and reasonable interpretations, Siring has not presented direct evidence of discriminatory animus sufficient to establish her *prima facie* case. Consequently, Siring must establish her *prima facie* case by way of the *McDonnell Douglas* burden-shifting framework.

### 2. *McDonnell Douglas Burden–Shifting*

For purposes of the summary judgment motion, defendants do not appear to take issue with three elements of Siring's *prima facie* case under the *McDonnell Douglas* burden-shifting framework, namely that: (1) Siring was within the class protected by the ADEA and ORS Chapter 659; (2) she suffered an adverse employment action when she was placed on a terminal contract, which ultimately resulted in the termination of her employment; and (3) she was replaced by a substantially younger person with equal or inferior qualifications.[3] Instead, the parties disagree

---

**3.** Siring points out that the fourth element "has been treated with some flexibility," and that "failure to prove replacement by a younger employee is 'not necessarily fatal' to an age discrimination claim," and asks the court to consider "circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Nidds,* 113 F.3d at 917. However, this element is only "flexible" when the discharge results from a general reduction in work force. *Id.* Regardless, Siring has provided evidence that the University hired a man "in his early 50's" to replace her as the CUESTE program's reading specialist at the Gresham campus. McNerney Depo. p. 31. Even though Siring has failed to submit any evidence about her replacement's qualifications or age, the University does not appear to take issue with this element. In light of the fact the degree of proof is minimal at this stage, this evidence is sufficient to establish

as to whether Siring performed her job in a satisfactory manner.

Siring contends that her favorable Third Year Review is dispositive because it is a critical step toward tenure progress. If the CPC does not recommend that the faculty member be continued at this step, then the faculty member is placed on a one-year terminal contract with employment terminated at the end of that contract. Jaeger and Lauritzen agree that this review is a "significant decision point" in a tenure-track faculty member's career at the University. Jaeger Depo., pp. 48–49; Lauritzen Depo., pp. 154–55. Since she successfully completed this milestone, Siring contends that her performance must be considered satisfactory enough to establish this element of her *prima facie* case.

The University disagrees, contending that in the year after her Third Year Review, Siring failed to make progress in the areas of improvement identified by the CPC which demonstrates that she was no longer performing her job in a satisfactory manner. Lauritzen's February 2010 classroom observation noted several deficiencies in the quality of Siring's teaching, causing her concern about whether Siring would be able to improve enough in time for her Fifth Year Review which would begin that next fall. The University also developed serious concerns about whether Siring would be able to satisfy the scholarly requirements clearly set forth in the Third Year Review, including that she "continue with conference presentations" and "find a research area and have at least one article published or scheduled for publication in a reputable journal at the time of her next review." In September 2009, Lauritzen informed Siring that she would need to attend national or international conferences and her article would need to be published in a peer-reviewed journal.

The University contends that by the time Siring was placed on a terminal contract in May 2010, she had had ample time to improve her teaching and scholarship, but failed to do so and thus, cannot establish her *prima facie* case.

 Notwithstanding the University's attempt to characterize her performance as unsatisfactory, Siring has set forth sufficient evidence to establish that at the time of the adverse employment action in May 2010, she was qualified for the position.

With respect to her teaching, Lauritzen and Jaeger concluded that the lesson they observed in May 2010 was good and that the students seemed engaged. Other than to inquire as to why Siring did not make better use of the overhead projector, they had no negative comments and did not write up an observation summary. This supports Siring's position that her teaching was indeed improving.

With regard to her scholarship, Siring has provided evidence that during the May 17, 2010 meeting, she informed Jaeger that she was currently working on an article for publication and suggested that he take a look at it. Presumably, this was the article she had previously submitted to the Dragon Lode, a peer-reviewed publication. Though the article was not initially published when she submitted it sometime in the fall of 2009, Siring revised and resubmitted it for consideration two more times, noting that she was ultimately dissuaded from resubmitting it a final time because it was "her last year," and the article was eventually published elsewhere. It appears as though Siring may have submitted the article to Dragon Lode as of the May 17 meeting, but had not yet heard back. Regardless of whether she had submitted the article or was merely planning

the fourth element of her *prima facie* case.

*Wallis,* 26 F.3d at 889.

to submit it again, Siring has submitted evidence that she was actively working toward publishing an article published in a peer-reviewed journal at the time of the meeting. The Third Year Review letter required her to have "at least one article published *or* accepted and schedule for publication ... at the time of her next review." Siring Depo. Ex. 8 (emphasis added). Assuming that the "time of her next review" meant her formal Fifth Year Review, Siring was attempting to comply by publishing the article in the Dragon Lode by the time her Fifth Year Review portfolio was due on approximately October 15, 2010.

As for her conference attendance, Siring had informed Costi on May 3, 2010, just a few weeks before the May 17 meeting, that she was not going to be teaching any summer courses in the fall for various reasons, later explaining that she needed to focus on writing and conference attendance in order to be prepared for her Fifth Year Review that fall. She also noted that she needed the time to prepare her presentation proposal for a national conference, as the proposal was due on June 10, 2010. This is evidence that Siring was also making progress in her scholarship.

The University argues that even according to Siring's understanding of the tenure requirements as communicated to her in 2006, she was not on track. Specifically, at the end of her third year, she had "only presented at one [c]onference and had one publication." Siring Depo. Ex. 14. This does not meet Siring's own expectation to "either present at two conferences or write two articles" in her third year. Siring Depo., p. 50. While this evidence provides some support for the University's position on the ultimate issue of whether Siring was placed on a terminal contract due to unsatisfactory performance, it is not dispositive. There is ample evidence that the tenure requirements were not rigid rules

or, even if they were, failure to satisfy those requirements automatically disqualified one from pursuing tenure. Even assuming that Siring needed to write two articles or present at two conferences during her third year, there is no evidence in the record that it would not have been acceptable for her to write one article and present at one conference, if she otherwise engaged in scholarly activity or later wrote the required articles and made the required presentations.

Given the minimal burden necessary to establish a *prima facie* case, Siring has established that her performance was satisfactory at the time of the adverse employment action in May 2010. Given the lack of dispute as to the remaining elements, Siring has established her *prima facie* case of age discrimination.

**B. *The University's Justification***

██ As a legitimate nondiscriminatory reason for its actions, the University points to evidence of Siring's substandard teaching and scholarship. The Handbook clearly states that research, conference participation, and other scholarship, are important criteria when considering whether to award tenure to a faculty member. Consequently, the minimum criteria to award tenure include, among other things, demonstration of "significant contributions to teaching," and "a productive commitment to research or scholarly activity." Siring's Third Year Review letter identified specific deficiencies in these areas and gave suggestions on ways to improve. Approximately one year later, after several inquiries regarding Siring's scholarship progress and at least one classroom observation, the University decided that Siring was not making sufficient progress in these areas. After one final classroom observation, the decision-makers concluded that it was in the University's

best interest to place Siring on a terminal contract. This is a legitimate, non-discriminatory justification for the action taken by the University.

## C. *Siring's Evidence of Pretext*

The burden then shifts to Siring to raise a genuine factual question as to whether the proffered reason is mere pretext for discriminatory animus. She must either show that the University's proffered explanation is unworthy of credence or that unlawful discrimination more likely motivated the adverse action. *See Chuang*, 225 F.3d at 1127. "Evidence already introduced to establish the *prima facie* case may be considered" to prove pretext. *Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir.1987), *cert denied*, 498 U.S. 939, 111 S.Ct. 345, 112 L.Ed.2d 309 (1990). However, Siring must do more than simply "establish a *prima facie* case and deny the credibility of [the University's] witnesses." *Wallis*, 26 F.3d at 890 (citation omitted).

■■■ The University argues that because both Lauritzen and Jaeger were involved in Siring's hiring and firing, the same actor inference prevents Siring from establishing pretext. "[W]here the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Coghlan v. American Seafoods Co., LLC*, 413 F.3d 1090, 1096 (9th Cir.2005), quoting *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir.1996). The amount of time that has elapsed between the hiring and the firing is relevant to whether the inference applies. *Id.*, 413 F.3d at 1097 (applying the same-actor inference where the time span was three years); *Bradley*, 104 F.3d at 270–71 (same with time span of one year); *Turcotte*, 2011 WL 1154486, at *3 (two years between promotion and termination was not close enough in time for

same-actor inference to apply). However, the key inquiry is whether the individuals involved in the hiring and firing decisions developed a bias during that period. *Coughlan*, 413 F.3d at 1097. "[A]n employer's willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." *Id.* at 1096.

■■■ Nearly four years had elapsed between Siring's hire in August 2006 and when she was informed of her termination and placement on a terminal contract in May 2010. Because this is not a short period of time, Siring must show that age-related animus developed over this period. The record is clear that over the four years of her employment, some animus developed, but it is not at all clear that this animus was necessarily age-related. Even during the May 17, 2010 meeting, Jaeger's allegedly age-related comments about her health and retirement came *after* he told her that she may not obtain tenure. Siring Depo., pp. 124–25. Based upon the evidence currently before the court, it is not reasonable to make that inference. Thus, the court must apply the same actor inference.

Nonetheless, as discussed below, Siring has presented sufficient evidence that the University's reasons for placing her on a terminal contract are not credible, are internally consistent, and are otherwise not believable.

### 1. *Shifting Requirements*

First, Siring points to the shifting expectations regarding the University's tenure requirements. Before she was hired, Siring inquired about a "professor writing with students and presenting with students," to which Jaeger responded that "it is much more valuable and much more difficult to write with students and to work with students at a presentation than doing

it by yourself or with another professor." Siring Depo., p, 31. This was important to Siring because Montana State University, her prior employer, did not consider writing with students as valuable as writing alone. *Id.* At the time she interviewed with the University, she was appealing Montana State University's initial denial of tenure. *See* Siring Depo. Ex. 1. Thus, tenure requirements were likely at the forefront of her mind in determining whether to make a move to the University.

Despite winning her appeal and obtaining tenure at Montana State University, Siring accepted the position at the University. The specifics of the University's tenure requirements were not clearly delineated in the Handbook provided to staff. While the Handbook enumerates the categories for review, emphasizes instruction and scholarship, and gives fair notice that scholarship includes publications and conference presentations, it provides no guidance as to the nature of the conferences or what kinds of journals are acceptable for publication. In September 2006, Lauritzen provided Siring much more specific information about her scholarship responsibilities, including the number of conferences and articles per year. During this discussion, there still was no mention of the nature of acceptable publications or conferences.

Two years later, in the fall of 2008, Siring and Lauritzen again met and discussed Siring's scholarship and expectations for preparing her portfolio for the Third Year Review. While Lauritzen identified scholarship as one of Siring's weaknesses, they still did not discuss specifics about acceptable types of journals or conferences. As Lauritzen predicted, Siring's Third Year Review letter indeed identified scholarship as one of Siring's weak points and provided general guidance as to how she might improve this area of her portfolio before her Fifth Year Review. However, it did not specifically address the nature of conferences or publications, instead recommending only that Siring should "continue with conference presentations, . . . find a research area and have at least one article published or accepted and scheduled for publication in a reputable journal at the time of her next review."

Not until July 2009 did Siring learn that she should submit her articles to peer-reviewed publications and that the articles she had published in the ORAcle were not acceptable. At this same time, Lauritzen informed Siring that her conference presentations at the local level were insufficient. Siring immediately inquired about conferences outside of Oregon, to which Lauritzen replied that Siring needed to make her writing/publication a priority. This was the first time that Siring felt like she knew what she could do to progress on the tenure track and might be "in trouble" for her Fifth Year Review.

Less than one year later, in May 2010, Siring was notified that she would not be continued. At that time, she was apparently working on revising her article for publication in the Dragon Lode, a peer-reviewed journal, and also planned to take time off from teaching summer school in order to focus on her proposal presentation for an out-of-state conference.

 While it appears clear that Siring was struggling with making satisfactory progress toward tenure in May 2010, there is also evidence that she was working toward meeting the requirements communicated to her in July 2009. That she was struggling with getting her article published in the Dragon Lode is evidence that she may well have not been able to finish that requirement before her Fifth Year Review, but she was certainly trying. Moreover, Siring understood that the requirements for her scholarship requirements had

changed, or at least had not been fully communicated to her at the beginning of her employment, yet she was still working hard to complete them, presumably in order to get a favorable Fifth Year Review and be granted tenure. This is specific evidence to support Siring's claim that the University's reasons for taking an adverse employment against her were indeed pretextual.

### 2. *Disregard of Normal Fourth Year Procedure*

■ Siring also contends that the University disregarded its usual and customary procedure by terminating her employment after her successful Third Year Review and a few months before the beginning of her Fifth Year Review.

In support, Siring contends that the University has no procedure for anything other than a Third and Fifth Year Review, making her fourth year review highly unusual and, thus, suspect. However, the administrative regulations clearly allow the University to make termination decisions for any reason as long as it provides the requisite notice. OAR 580–021–0315(1); OAR 580–021–0305(1); *see also* Jaeger Depo., p. 100. The regulations further require that tenure-track faculty members be appointed for one-year, which contemplates some kind of review after each year, though the particulars of that review is up to the University. OAR 580–021–0110(1)–(2);OAR 580–021–0100(1)(b)(A). Thus, the University had a right to review Siring's tenure-track progress at any time. That it did not have particular procedures in place for a review during the fourth year does not necessarily render that review suspect.

Even though the University had no particular procedure for reviews other than in the third and fifth years, the CPC would occasionally confer about tenure-track faculty members' progress. In fact, at the time the University reviewed Siring's prospects for continuation on to the Fifth Year Review, it also was reviewing another tenure-track faculty member in his fourth year who was struggling to meet the requirements in his Third Year Review letter. Jaeger Depo. Ex. 55. Though the University elected to give that faculty member an additional year to prepare for tenure review, it was not required to extend this same courtesy to Siring. *Id.* Jaeger testified that though he did not recall the specifics, the University had, in the past, placed other tenure-track faculty members on a terminal contract after their fourth year. *Id.,* p. 113.

While the University might not have a formal, organized process for conducting reviews of tenure-track faculty members in their fourth year, the administrative rules contemplate that a university may check on progress prior to the formal Fifth Year Review. Consequently, the fact that Siring was placed on a terminal contract at the end of her fourth year, rather than after her Fifth Year Review, was not necessarily an unusual procedure and is not particularly strong evidence of pretext.

### 3. *Suspect Committee Meeting*

■ Siring also relies on the actual process of the termination decision as evidence of pretext. Specifically, she points to the fact that Lauritzen hastily scheduled the CPC meeting on May 24, 2010, just seven days after she first decided that a terminal contract was appropriate. In addition, only three members of the CPC attended that meeting; the student member was apparently not even notified or, at least, was not present; McNerney, a faculty member, also was missing (Evans Depo., pp. 25–26); Siring was not advised of the meeting or even that any formal action was being taken; the meeting lasted only 15–20 minutes; no notes were taken; and no documents were signed indicating the CPC's decision.

In response, the University points to Evans's testimony that the CPC meeting was arranged at least a few days in advance, though he does not recall whether it was by email, telephone calls, or some other means. Evans Depo., pp. 24–25. The University also notes that as the Dean, Lauritzen was not even required to meet with the CPC in making the decision to place Siring on a terminal contract. *See id*, p. 36.

While there could be legitimate reasons for the way the CPC meeting was called and conducted, the timing of the decision to terminate Siring could be viewed as suspect. Assuming the evidence in the light most favorable to Siring, it is reasonable to infer that after Siring informed Lauritzen and Jaeger that she planned to work for five more years, Lauritzen concluded that Siring may decide to pursue tenure rather than retire. Thus, she rushed to finalize the decision to place Siring on a terminal contract. This inference supports Siring's claim that the University's reasons for taking an adverse employment against her were indeed pretextual.

### 4. *Conclusion*

While hardly the only interpretation of the evidence, Siring has provided specific and substantial evidence to demonstrate that the University's reason for placing her on a terminal contract after her fourth year of employment was a pretext for age discrimination. Accordingly, the University's motion for summary judgment should be denied on Siring's age discrimination claims.

## II. *Retaliation (Third, Fourth, and Fifth Claims)*

 Siring alleges claims for retaliation arising under the ADEA and Oregon law. Her two claims for retaliation under Oregon law allege that she was discharged in violation of: (1) ORS 659A.030(1)(f)

based on complaints of age discrimination made to Lauritzen and Jaeger; and (2) ORS 659A.230, the whistle-blowing statute, for filing her tort claim notice and BOLI complaint. The required elements for a *prima facie* case for these state law claims are the same as those required ADEA retaliation claims, and the same *McDonnell Douglas* burden-shifting approach applies. *See Dawson*, 630 F.3d at 935; *Payne v. Apollo College–Portland, Inc.*, 327 F.Supp.2d 1237, 1245 (D.Or.2004) (applying Title VII elements to state law claim for retaliation brought under ORS 659A.030(1)(f)); *Larmanger v. Kaiser Found. Health Plan*, No. 3:11–CV–00089–BR, 895 F.Supp.2d 1033, 1048–49, 2012 WL 3921777, at *15 (D.Or. Sept. 7, 2012) (applying burden-shifting framework to state law whistle-blower retaliation claim brought under ORS 659A.230).

 First, Siring must satisfy her *prima facie* case by showing that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between her activity and the employment action. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000). "[O]nce the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its decisions." *Yartzoff*, 809 F.2d at 1376 (citation omitted). Where an employer does so, "the legally mandatory inference of retaliatory discrimination arising from the plaintiff's prima facie case drops away." *Id.* at 1377 (citation omitted). The burden of production again falls on the plaintiff to show that the explanation is a pretext for impermissible retaliation. *Id.* This burden "merges with the plaintiff's ultimate burden of persuading the court that [she] is the victim of retaliation." *Id.*

## A. *Prima Facie Case*

Siring alleges that she engaged in the following protected activities: (1) in March 2010, she protested Lauritzen's age-related comment about spending more time with her grandchildren; (2) on May 24, 2010, she protested by letter what she perceived as discriminatory treatment based on her age; and (3) on July 23, 2010, she submitted her Tort Claim Notice and four days later filed an administrative complaint with BOLI.

The March 2010 email protesting Lauritzen's comment about her grandchildren is not protected activity. Instead it is only a general complaint without any mention of age and did not reasonably put Lauritzen on notice "that unlawful discrimination was at play ... sufficient to constitute protected activity for purposes of the ADEA." *Bahri v. Home Depot USA, Inc.*, 242 F.Supp.2d 922, 957–58 (D.Or.2000). Therefore, the University should be granted summary judgment as to any retaliation claim based on that email.

In contrast, the May 24, 2010 letter, Tort Claim Notice and BOLI complaint do constitute protected activities. However, the University disputes that it took any adverse employment action against her as a result and also contends that Siring cannot establish a sufficient causal link between those protected activities and any allegedly retaliatory conduct.

### 1. *Adverse Employment Action*

An adverse employment action is an "employer action[ ] that would have been materially adverse to a reasonable employee ... [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

The University does not dispute that placing Siring on a terminal contract in May 2010 was an adverse employment action, but denies that it took any adverse employment actions against her after she filed her Tort Claim Notice and BOLI complaint in late July 2010.

The alleged adverse employment actions after late July 2010 involved discussions concerning Siring's alleged alcohol use. However, conduct cannot constitute retaliation if the employee does not know about it because such conduct cannot deter the employee from engaging in protected activity. *See Campbell v. Knife River Corp.*, 783 F.Supp.2d 1137, 1155 (D.Or.2011). Siring acknowledges that issues concerning alcohol were never raised with her during her employment at the University. Siring Depo., p. 184. Consequently, any discussion of Siring's alleged alcohol use cannot be considered an adverse employment action for purposes of a retaliation claim.

The remainder of Siring's alleged adverse employment actions after late July 2010 concern actions by Costi during Siring's last year of employment, including: (1) embarrassing Siring when she attended a March 2011 staff meeting; (2) rescheduling the student teaching seminar in March 2011 so that Siring could not attend; (3) excluding Siring from participating in staff decisions and communications about her students and in other matters that she had previously participated; (4) excluding her from the spring 2011 student teacher assignments, resulting in Siring shouldering a heavier supervision load, including supervision in McMinnville, an inconvenient location for Siring; and (5) attempting to confiscate Siring's keys two weeks early, despite knowing that Siring's contract was scheduled to run through June 30, 2011.

According to the University, these actions cannot give rise to a retaliation claim

because Costi was not Siring's supervisor, but merely "a less than half-time glorified secretary." The only case cited in support, *Burlington Indust., Inc. v. Ellerth,* 524 U.S. 742, 764–65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), stands for this principle in the hostile work environment context. The University has cited no case extending this principle to the retaliation context. In addition, the Ninth Circuit has made clear that Title VII and the ADEA do not permit co-workers or supervisors to be held individually liable, as both statutory schemes "limit civil liability to the employer." *Miller v. Maxwell's Int'l,* 991 F.2d 583, 588 (9th Cir.1993). But Siring does not seek to hold Costi personally liable. Instead, she contends that the University should be held liable for Costi's retaliatory actions that were materially adverse to her.

As the CUESTE Program Director at the Gresham campus, Costi did not have any supervisory authority over Siring, but Siring has submitted evidence of Costi's administrative responsibilities that directly impacted her. Jaeger expected and "depended upon" Costi to report on the day-to-day interactions between members of the Gresham staff, as well as any other incidents that she thought Jaeger should know about. Costi Depo., p. 108; Jaeger Depo., pp. 29, 33. Viewing the facts in the light most favorable to Siring as the non-moving party, Costi took various actions against her that caused Siring to feel excluded, ignored, and humiliated. Consequently, if Costi acted with implicit authority from Jaeger and, in fact, dissuaded Siring from making or supporting a charge of discrimination, then Costi's actions could conceivably constitute adverse employment actions. However, as discussed below, Siring lacks evidence of that Costi's actions were caused by any protected activity.

## 2. *Causation*

■■■■■ "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [her] protected activity was the likely reason for the adverse action." *Cohen,* 686 F.2d at 796 (citations omitted). "[A] *prima facie* case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory [activity]." *Yartzoff,* 809 F.2d at 1376. The showing required to meet this burden is minimal, but it is "[e]ssential to a causal link ... that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982) (citations omitted).

### a. *May 24, 2010 Letter*

The University argues that Siring cannot establish causation because there is no evidence that any CPC member was aware of Siring's letter before the May 24, 2010 meeting and decision to place Siring on a terminal contract. In the alternative, even if a CPC member did know about Siring's letter, the University argues that the CPC was simply following through on Lauritzen's prior non-retaliatory decision to place her on such a contract. *See Cohen,* 686 F.2d at 797 ("An employer who has decided upon a new policy is not guilty of unlawful retaliation simply because it proceeds with the implementation of that policy after learning that one of the employees who will be affected thereby has recently engaged in protected activity."). In support, the University points to the fact that Jaeger and Lauritzen informed Siring on May 17, 2010, that she would be placed on a terminal contract, yet Siring did not send her letter until one week later. The fact that she happened to send it the same

morning that the CPC met to discuss her employment is merely coincidental.

Siring responds that no evidence supports the testimony by Lauritzen and Jaeger that they first became aware of her letter after the CPC meeting. The University has not produced a fax confirmation sheet showing when Jaeger received Siring's May 24, 2010 letter, or any electronic records documenting when the CPC meeting was arranged, or even whether it was actually held at noon on May 24, 2010, as the University claims. The only actual document or business record in support of the date and time of the CPC meeting is a handwritten entry on Lauritzen's paper calendar. Lauritzen Depo. Ex. 70. According to Siring, a jury could conclude that Lauritzen and/or Jaeger did know of Siring's letter at the time the CPC met, as a result, hastily proceeded with her termination. However, Siring also cannot produce a fax confirmation sheet confirming when she sent her letter to the various University officials and is not sure to whom she faxed the letter that morning. Accepting that Siring faxed her letter to Jaeger, and possibly also to Lauritzen, in the morning, whether anyone on the CMC read the letter prior to making the final decision at noon is essential to resolution of Siring's *prima facie* case for her retaliation claim.

Nonetheless, the University contends that this factual dispute is immaterial because Siring understood at the May 17, 2010 meeting that she was being placed on a terminal contract and that the 2010–2011 school year would be her last at the University. Siring Depo., pp. 131–32 ("He then said that he would make this [my] last year. He said I would be given a terminal contract, and he would make it as easy as possible for me."). Thus, according to the University, the decision to place Siring on a terminal contract had already been communicated to her before she sent her May 24, 2010 letter, such that her letter could not have been the reason that the CPC decided to take adverse action against her.

Siring responds that the University's characterization of her testimony is taken out of context. Instead, she testified only that placing her on a terminal contract was one of two options presented at the May 17, 2010 meeting: (1) she could decide to pursue tenure even though, according to Jaeger, she was unlikely to achieve it (*id.,* p. 131); or (2) she could quit and be placed on a terminal contract. *Id.,* p. 132 ("I believe that Dr. Jaeger said it would be a one-year terminal contract. I understood it from—what I understood was if you were not granted tenure, you would be given a one-year terminal contract."). In support of this interpretation, Siring points to her undisputed testimony that, at the end of the meeting, Jaeger told her to let them know what she was going to decide about pursuing tenure, leading to the inference that she was presented with a choice.

Siring's testimony about the May 17 meeting is subject to two different, but equally reasonable, interpretations. There is support for the University's position that Jaeger told her that she would not be granted tenure and was being placed on a terminal contract immediately, such that the 2010–2011 school year would be her last year. It is equally plausible that Siring understood that if she decided to pursue tenure and failed, then she would be placed on a one-year terminal contract, making the 2011–2012 school year her last year. These differing interpretations cannot be resolved on summary judgment.

To the extent that Siring's retaliation claim is premised on her May 24, 2010, letter, material issues of fact exist on two issues critical to her *prima facie* case. First, the fact-finder will need to resolve

whether the decision to place Siring on a terminal contract was made on May 17 or May 24, 2010. If it was made and communicated to Siring on May 17, 2010, then her subsequent letter cannot fairly be considered the cause of the adverse employment action. Second, if the University made its decision at the CPC meeting on May 24, 2010, then the fact-finder will need to resolve whether Lauritzen or Jaeger received Siring's letter prior to that meeting and whether any other CPC member was aware of it.

 Because material issues of fact exist regarding whether Siring's May 24, 2010, letter caused the University to place her on a terminal contract, and since this is the only actionable allegation of protected conduct, the court cannot proceed to the next steps in the *McDonnell Douglas* burden-shifting analysis. The University's motion for summary judgment should be denied to the extent that Siring's retaliation claims are based on the age discrimination complaints raised in her May 24, 2010, letter.

### b. *July 2010 Tort Claim Notice and BOLI Complaint*

 The University argues that Siring cannot establish a causal link between the filing of her Tort Claim Notice and BOLI complaint in late July 2010 and Costi's later actions. Siring appears to primarily rely upon the proximity of her protected activity and Costi's actions. "[W]hen adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir.2000) (citing cases). Siring does not allege that any specific retaliatory action was taken against her in the summer or fall of 2010, and she was out on medical leave during the 2011 winter term.

Most of the allegedly retaliatory action took place beginning in March 2011, nearly eight months after she filed her BOLI complaint.

Though there is no magic time-frame in which to infer causation, the circumstances here do not reasonably support such an inference. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir.2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation."). Siring apparently taught classes during the fall 2010 term without incident. With the exception of feeling a bit out-of-the-loop while on medical leave during the winter term, she did not experience any notable adverse treatment during this period. Not until she was preparing to return to work for the spring term did she begin to experience problems with Costi, which apparently continued through the end of her employment four months later in June 2011. The record is devoid of evidence that Costi knew of Siring's Tort Claim Notice and BOLI complaint. Even if it is reasonable to infer that she did know, Siring experienced no adverse action from Costi for eight months. Thus, she has failed to demonstrate that her BOLI complaint was the reason for the allegedly retaliatory actions taken by Costi during her last four months of employment.

Accordingly, the University's motion for summary judgment should be granted to the extent that Siring's retaliation claims are based on actions that occurred after July 2010.

### III. *Disability Discrimination and Rehabilitation Act (Sixth, Seventh, Eighth Claims)*

#### A. *Legal Standard*

 Title I of the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 USC § 12112(a). In order to prevail on an ADA claim, a plaintiff must first establish a *prima facie* case of discrimination by showing that she: (1) has or is perceived as having a disability; (2) is a qualified individual; and (3) was unlawfully discriminated against because of her disability. *See e.g., Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243, 1246 (9th Cir.1999). The standards for determining employment discrimination under the Rehabilitation Act are the same as those used in Title I of the ADA. *See* 29 USC § 794(d); *Fleming v. Yuma Reg'l Med. Ctr.,* 587 F.3d 938, 940–41 (9th Cir. 2009); *Walton v. U.S. Marshals Serv.,* 492 F.3d 998, 1005 (9th Cir.2007). The standard for establishing a prima facie case under the Oregon disability statutes is the same as under the analogous ADA provision. *See Spicer v. Cascade Health Servs., Inc.,* No. CV–03–6377–ST, 2005 WL 2211097, at *5 (D.Or. Sept. 8, 2005) ("Oregon laws on disability discrimination are to be construed in a manner consistent with the federal ADA."); *Wheeler v. Marathon Printing, Inc.,* 157 Or.App. 290, 301 n. 6, 974 P.2d 207, 213 n. 6 (1998) (noting that the Oregon statutory scheme regarding workplace discrimination against disabled persons "contain[s] language significantly similar to the ADA"); *see also* ORS 659A.139 ("ORS 659A.112 to 659A.139 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended.").

 Title I ADA cases and analogous state claims are analyzed using the burden-shifting analysis from *McDonnell Douglas. See e.g., Risteen v. Wal–Mart Stores, Inc.,* No. CV–09–6020–AA, 2010 WL 1838105, at *3 (D.Or. April 30, 2010), citing *Snead v. Metropolitan Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1087 (9th Cir. 2001). Courts use a similar burden-shifting analysis for Rehabilitation Act Claims. *Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990). Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to provide a non-discriminatory reason for the adverse employment action. *McDonnell Douglas Corp.,* 411 U.S. at 802–803, 93 S.Ct. 1817. If defendant does so, the burden then shifts back to plaintiff to show defendant's reason was a pretext for discrimination. *Id.*

 Siring does not allege that she is actually disabled, but instead alleges that she was "regarded as" disabled by the University. Complaint, ¶ 5. An individual is "regarded as" having a disability under the ADA if she can establish that she was discriminated against "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 USC § 12102(3)(A). To establish a "regarded as" claim, the employer must harbor a misperception about the individual. The employer "must believe either that [the individual] has a substantially limiting impairment that [she] does not have or that [she] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Coons v. Sec'y of U.S. Dep't of Treasury,* 383

F.3d 879, 886 (9th Cir.2004). In other words, "in 'regarded as' cases, the employer must perceive the individual as having an actual disability under the ADA." *Deppe v. United Airlines, Inc.*, 217 F.3d 1262, 1265 (9th Cir.2000).

██ Alcoholism is a recognized disability under the ADA. *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001); 28 CFR § 35.104. Though the Rehabilitation Act previously did not include alcoholism in its definition of disability, the ADA Amendments Act of 2008, which stated that the scope of the ADA was intended to be broad and inclusive, affected the Rehabilitation Act's meaning of disability. *See* 42 USC § 12102(4)(A) (explaining that the coverage provisions are to be construed broadly). The Rehabilitation Act now incorporates the ADA's definition of disability. 29 USC § 791(g); 29 USC § 705(9)(B); 29 USC §§ 705(20)(B) (incorporating the ADA's disability definition).

## B. *Analysis*

The evidence supporting Siring's ADA claim that she was regarded as an alcoholic consists of several written communications. First, in December 2009, Costi informed Lauritzen of a conversation with two students who were purportedly worried about Siring and suspected that she was abusing alcohol. However, Costi noted her personal belief that Siring did not have a drinking problem.

Six months later on May 18, 2010, the day after Lauritzen and Jaeger met with Siring and allegedly tried to dissuade her from pursuing tenure, Costi observed that Siring's behavior was strange, prompting at least three faculty members to inquire as to whether she was intoxicated. On Sunday, May 23, 2010, Costi reported her May 18 observations of Siring "very high on drugs" and "smell[ing] like a distillery" and opined that the students were right. Costi Depo., p. 78, Ex. 100.

In an email dated May 25, 2010, to several University officials regarding Siring, Jaeger expressed concern about "the comments and reports of students, MHCC partners, and our other faculty at MHCC: which "are, in themselves, of enough substance to effect [*sic*] the aim of this personnel action." Jaeger Depo., Ex. 55. Nonetheless, he denied that alcoholism had been involved in the decision to terminate Siring.

During the graduation ceremony on June 11, 2010, Costi again reported smelling alcohol on Siring's breath and observing strange behavior. McNerney also had noticed "slurred speech" a few days earlier.

Finally, in March 2011, Costi discussed with Hopwood, the University's HR Director, her observations that Siring was under the influence of alcohol at work.

Siring acknowledges that none of these issues concerning alcohol use were ever raised with her during her employment at the University. Siring Depo., p. 184. In addition, Evans, a CPC member, never heard anyone talk about Siring appearing drunk at work or that she otherwise had alcohol issues. Evans Depo., p. 47.

The critical question is how the University's decision-makers perceived and reacted to the reports of Siring's alleged alcohol-related limitations. The evidence on this issue is disputed. The reports of Siring's alcohol use were quite sparse (December 8, 2009; May 18 and 23, 2010) until after she had been placed on a terminal contract. Thus, a reasonable fact-finder could conclude that she was not "regarded as" an alcoholic at the time of the allegedly discriminatory action.

██ On the other hand, given the substance of the reports concerning Siring's alcohol use, a reasonable fact-finder could reach the opposite conclusion. Especially

significant is Jaeger's mention of some identified reports of Siring's behavior that were "most concerning" to him and which presumably justified, on its own, the decision place Siring on a terminal contract. Jaeger Depo. Ex. 55. It is not clear what Jaeger was referring to when mentioning the comments made by "MHCC partners and our other faculty at MHCC," but given the context of this statement, a reasonable fact-finder could conclude that the University had received reports from individuals working at the MHCC campus about Siring's alcohol use. *Id.* Though Jaeger does not specifically mention alcohol use, a reasonable fact-finder could conclude that it was a reason for recommending that Siring not be permitted to pursue tenure in her fifth year. This evidence is especially troubling in light of Jaeger's later deposition testimony that alcoholism was not involved in the decision to place Siring on a terminal contract. To the extent that the University contends that it did not consider Siring's alcohol use as indicative of a larger problem, this evidence is undermined by Costi's May 23, 2010 email, which indicates that in the nearly six months since she first heard of Siring's alcohol use, her opinion regarding whether Siring had a problem had changed; despite her prior belief that Siring did not have a drinking problem, she now had reason to believe that she drank "substantially." Costi Depo. Ex. 100.

Resolution of this issue requires weighing the evidence and the relative credibility of the witnesses which is not appropriate on summary judgment. *Balint,* 180 F.3d at 1054. This inquiry is "most appropriately conducted by the factfinder, upon a full record." *Schnidrig,* 80 F.3d at 1410. Given material issues of fact exist regarding whether the University regarded Siring as disabled on account of its misperception that she was an alcoholic, the University's motion for summary judg-

ment should be denied on Siring's disability discrimination claims.

### RECOMMENDATION

For the reasons discussed above, defendant's Motion for Summary Judgment (docket # 24) should be GRANTED IN PART AND DENIED IN PART as follows:

(1) GRANTED as to those portions of the Third, Fourth, and Fifth Claims (retaliation) to the extent that they are based on actions taken after plaintiff's March 2010 email which is not a protected activity and after she filed her Tort Claim Notice and BOLI complaint in July 2010 due to lack of causation;

(2) DENIED as to those portions of the Third, Fourth, and Fifth Claims (retaliation) to the extent they are based on actions taken after plaintiff sent her May 24, 2010 letter; and

(3) DENIED as to the remaining claims.

### SCHEDULING ORDER

These Findings and Recommendation will be referred to a district judge. Objections, if any, are due Monday, October 22, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED October 3, 2012.